UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONALD R. DUDLEY, D.C. d/b/a
HEALTHSOURCE CHIROPRACTIC,

                          Plaintiff,              07-CV-6631

            v.                                    **DECISION AND
                                                  ORDER**

HEALTHSOURCE CHIROPRACTIC, INC. and
STEPHEN T. DIVITO, D.C.,

                          Defendants.

_____

## INTRODUCTION

     Plaintiff Donald R. Dudley, D.C. d/b/a HealthSource Chiropractic
("plaintiff" and/or "Dr. Dudley") brings this action alleging
trademark infringement, cybersquatting, unfair competition and false
designation of origin under the common law of the State of New York
and the Lanham Act, 15 U.S.C. §§ 1125(a) and 1125(d) against
HealthSource Chiropractic, Inc. (the "Franchisor") and one of its
franchisees, Stephen T. Divito, D.C. ("Dr. Divito") d/b/a HealthQuest
Chiropractic (collectively "defendants").

     Plaintiff moved this Court for an Order preliminarily enjoining
the defendants from using the domain name www.healthsourcechiro.com.
Plaintiff essentially is seeking that defendants secure a new domain
name that does not combine the mark "HealthSource" with the word
"chiropractor" or any of its variants. In addition, with respect to
Dr. Divito's use of "HealthQuest Chiropractic," plaintiff is seeking
to prevent defendant's use of the name in the Rochester area market
as plaintiff argues that it is confusingly similar to plaintiff's
mark, HealthSource Chiropractic. Further, plaintiff is seeking, and

defendants agree to refrain from, using HealthSource Chiropractic within the Rochester area market, subject to plaintiff's submission of proof on the issue of the scope of the geographic area. Defendants' argue that plaintiff's reference to the "Rochester area market" as including Monroe County and the five contiguous counties is too broad since plaintiff has failed to submit evidence constituting plaintiff's market penetration into this area.

## **BACKGROUND**

Plaintiff, Donald R. Dudley, D.C. is a chiropractor licensed in the State of New York. See Donald R. Dudley, D.C. Affidavit, ¶4. ("Dudley Aff.") In 2003, he established his private practice located at 90 Erie Canal Drive, Rochester, New York. See Dudley Aff., ¶6. In connection with the practice of chiropractic medicine, he filed a certificate to do business under the assumed name HealthSource Chiropractic with the Monroe County Clerk's Office. See id. ¶4. At the same time, plaintiff created an Internet Web site and registered the domain name healthsourcechiropractic.com. See id. ¶5. In addition, plaintiff retained a graphic artist and Web site developer to create a web site for promotional and marketing purposes as well as to provide an additional means for patients to contact and get information regarding plaintiff's practice. See id., ¶¶6,8.

From 2003 until the present, plaintiff used the mark HealthSource Chiropractic when communicating with the public about his services. See Dudley Aff., ¶¶4-8. Plaintiff has received local

publicity in the community for the work he does. In addition to advertising on the Internet and in the Yellow Pages,[1] Dr. Dudley invested a substantial share of his revenues in advertising and promotional efforts, including an affiliation with the Rochester area sports teams such as the Rochester Americans, the Rochester Rattlers, the Rochester Knighthawks, and the Rochester Rhinos. <u>See</u> Dudley Aff., ¶¶11-12. In exchange for furnishing chiropractic treatment to these teams and some cash payments, plaintiff's practice has been featured in team magazines and announcements during the games, plaintiff's practice logo has been placed on the playing field and has been noted in message board displays and has been promoted during live reads of radio advertisements during game broadcasts. <u>See</u> <u>id.</u> Moreover, since December 2003, plaintiff has used other marketing and promotional means to promote his practice and the HealthSource Chiropractic mark. <u>See</u> <u>id.,</u> ¶¶13-18. As a result of this continuous usage, plaintiff alleges that he has common law rights to the mark HealthSource Chiropractic.

Plaintiff alleges that Dr. Dudley is the senior user of the mark HealthSource Chiropractic both locally and on the Internet. However, defendants have tried to establish a presence on the Internet and in the Rochester area market through the use of the HealthSource Chiropractic mark and the allegedly confusingly similar mark HealthQuest Chiropractic. Further, plaintiff alleges that while Dr.

---

[1]In addition to placing a listing with the Yellow Pages, plaintiff placed an ad on yellowpages.com.

Divito has attempted to use the HealthQuest Chiropractic mark, much of his promotional material still has the HealthSource Chiropractic mark. In addition, the Franchisor's own web site identifies Dr. Divito's practice as "HealthSource of Rochester." Moreover, plaintiff alleges that various web sites promoting franchise opportunities have used plaintiff's own logo to market the Franchisor's business model.

On or about July 2005, defendant Franchisor decided to name its franchise clinics "Healthsource Chiropractic" and selected HealthSource Chiropractic, Inc. as its corporate name. See Chris Tomshack, D.C. Affidavit, ¶6. ("Tomshack Aff.") During that same time frame, the Franchisor performed a trademark search of the records at the United State Patent and Trademark Office ("USPTO") including the Ohio Secretary of State. See id., ¶7. No registered marks or pending applications for HealthSource Chiropractic were located in the records of the USPTO and no one had registered HealthSource Chiropractic with the Ohio Secretary of State. See id. Accordingly, the Franchisor proceeded to file a trademark application for the word mark HealthSource Chiropractic on November 25, 2005 and a second application for HS HealthSource & Design on December 15, 2005.[2] See id., ¶¶13-14. In addition, the Franchisor registered the name Healthsource Chiropractic, Inc. in Ohio. The USPTO approved the application for the word mark HealthSource Chiropractic and it was published for opposition. Thereafter, a Notice of Opposition was

---

[2]On July 10, 2007, HS HealthSource & Design was registered with the U.S. Trademark Office.

filed against that application and settled.[3] On January 8, 2008, the Trademark Office issued a Notice of Allowance for HealthSource Chiropractic. See Tomshack Aff., ¶13. Accordingly, HealthSource Chiropractic will be registered some time in the near future. See id.

The Franchisor claims that it never knew about plaintiff's use of HealthSource as it relates to Dr. Dudley's clinic at the time it adopted the name for its franchise operation and filed its trademark applications. See Tomshack Aff., ¶15. On or about March 2006, several months after filing for trademark protection, the Franchisor became aware that the domain name www.healthsourcechiropractic.com was registered. See id., ¶16. However, defendant does not recall whether the website had content. See id. Because healthsourcechiropractic.com was unavailable, the franchisor registered the domain name as www.healthsourcechiro.com on March 16, 2006. See id. Defendant argues that it registered the domain name www.healthsourcechiro.com months after it had already filed any intent-to-use trademark applications for HealthSource Chiropractic and HS-HealthSource and Design. See id. Further, it had been eight months after the franchise name had been searched and cleared and substantial expenditures were invested in the franchise start-up. See id.

Subsequent to March 2006, defendant HealthSource Chiropractic, Inc. expanded from having one franchise to over one hundred seventy (170) franchises. See Tomshack Aff., ¶10. In April 2007, Dr. Divito

---

[3]It is not clear in the record who filed the notice of opposition.

opened his franchise in the Rochester area. According to defendants, because they were aware of Dr. Dudley's practice at that time, they agreed that Dr. Divito would operate his franchise under the name HealthQuest Chiropractic. See id., ¶17. Defendant HealthSource did not believe the name would present a problem given that it had been operating chiropractic clinic in the Ohio area under the HealthQuest Chiropractic name since 2001. See id., ¶4. The Franchisor claims that it has revised its website www.healthsourcechiro.com to identify Dr. Divito's clinic as HealthQuest of Rochester upon learning that the clinic was incorrectly designated on its website. Further, Dr. Divito distributed advertising materials that referred to HealthSource in small print at the bottom of the materials. However, according to defendants Dr. Divito has since taken his printing in-house to ensure that no advertising materials are distributed in relation to his clinic that refer to HealthSource.

In April 2007, Dr. Dudley, through his counsel, sent cease and desist letters to both the Franchisor and Dr. Divito requesting that they discontinue use of the mark HealthSource Chiropractic and any confusingly similar variations including HealthQuest Chiropractic as well as any other trademark infringement concerns. See Dudley Aff., ¶30. The plaintiff sent another follow up letter to both defendants during the same time frame. However, neither defendants responded in any way to the plaintiff's letter.

**DISCUSSION**

I.   **Standard for Preliminary Injunction**

For a party to be entitled to a preliminary injunction, the party must demonstrate: (1) immediate irreparable harm; and (2) that it will either (a) likely succeed on the merits of the case, (b) or that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships between the parties tips decidedly in favor of the party requesting the relief. See Virgin Enters., Ltd. v. Nawab, 335 F.3d 141, 145 (2d Cir.2003) (citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979)); Fed. Express Corp. v. Fed. Expresso, Inc., 201 F.3d 168, 173 (2d Cir.2000). Thus to determine whether or not plaintiff is entitled to a preliminary injunction, it is necessary to analyze the merits of the case under the substantive law developed in this Circuit. Should plaintiff demonstrate a likelihood of success on the merits, the inquiry then turns to whether or not it has demonstrated irreparable harm.

II.  **Application of the Preliminary Injunction Standard**

A.   **Likelihood of Success on the Merits**

As previously noted, plaintiff brings various causes of action against defendants, two of which serve as the basis for plaintiff's preliminary injunction request, namely cybersquatting and trademark infringement. These claims will be examined seriatim to determine plaintiff's likelihood of success on the merits.

7

### 1.   Cybersquatting in violation of the Lanham Act

Plaintiff alleges that defendant's use of the domain name www.healthsourcechiro.com is in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d). See Pl. Reply Br. at 2. Defendants contend that plaintiff should not be granted the drastic relief of a preliminary injunction when he has not been able to meet the required elements of the ACPA including the distinctiveness of his mark and the fact that defendants have acted in bad faith. See Defs. Sur-Reply Br. at 3-4.

The ACPA provides, in pertinent part, that a person shall be liable in a civil action by the owner of a mark if, without regard to the goods or services of the parties, that person:

 (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section and

 (ii) registers, traffics in, or uses a domain name that-

 * * *

 (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark[.]

See 15 U.S.C. § 1125(d)(1)(A). To succeed on a claim under the ACPA, Plaintiff must prove that: (1) defendant had a bad faith intent to profit from use of the mark; (2) the mark is either distinctive or famous; and (3) defendant's domain name is identical or confusingly similar to Plaintiff's domain name. See Sporty's Farm LLC v. Sportsman's Mkt., Inc., 202 F.3d 489, 497-99 (2d Cir.2000).

### a.   Distinctive or Famous

Under the ACPA, the Court will first determine whether HealthSource Chiropractic is a distinctive or famous mark and thus entitled to the ACPA's protection. <u>See</u> 15 U.S.C. §1125(d)(1)(A)(ii)(I)(II). "Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used-when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." <u>See</u> <u>Sporty's Farm</u>, 202 F.3d at 497 (citing <u>Nabisco, Inc. v. PF Brands, Inc.</u>, 191 F.3d 208, 215-16 (2d Cir.1999), overruled in part on other grounds by <u>Moseley v. V Secret Catalogue, Inc.</u>, 537 U.S. 418, (2003)).

The Second Circuit recognizes four general levels of distinctiveness. Marks are classified, in ascending order of strength, as "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." <u>See</u> <u>Star Indus. v. Bacardi & Co.</u>, 412 F.3d 373, 384-385 (2d Cir.2005). Generic marks are those consisting of words identifying the relevant category of goods or services. <u>See</u> <u>id.</u> at 385. They are not at all distinctive and thus are not protectable under any circumstances. <u>See</u> <u>id.</u> Descriptive marks are those consisting of words identifying qualities of the product or services. <u>See</u> <u>id.</u> They are not inherently distinctive, but are protectable provided they have acquired secondary meaning. <u>See</u> <u>id.</u> Suggestive marks are inherently distinctive. <u>See</u> <u>id.</u> Suggestive marks are those that are not directly descriptive, but do suggest a quality of the

product through the use of imagination, thought and perception. _See id._ Finally, arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion. _See id._

While Plaintiff states that the mark is suggestive, (see Pl. Reply Br. at 8), the Court finds that the mark HealthSource Chiropractic, is at most descriptive. Therefore, if the mark has secondary meaning, then it is protectable under the Lanham Act. Under Second Circuit precedent, the following factors are relevant in determining secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. _See_ Centaur Commc'n v. A/S/M Commc'n, 830 F.2d 1217, 1222 (2d Cir.1987).

With respect to the first factor, advertising expenditures, plaintiff avers that it has expended over $10,000 in order to promote its services. _See_ Dudley Aff. ¶11-18. Although this amount is relatively modest, it is apparent that plaintiff has achieved at least a modicum of advertising success, which the Court finds compelling. See Centaur Commc'n, 830 F.2d at 1222 (citing First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir.1987) (noting that the test of secondary meaning is not the size of the expenditures used to create [a mark] but its effectiveness). Plaintiff has used its advertising expenditures to sponsor sports

events, attend events, promote its services and maintain its website. See id. In addition, plaintiff has consistently directed its marketing efforts toward the target customer group, that is, people in the Rochester area market. See Centaur Commc'n, 830 F.2d at 1222 (finding modest advertising expenditures weighed in favor of secondary meaning because plaintiff invested efforts in publicizing its connection to the mark by, inter alia, sending brochures to the relevant consumer group). Therefore, the Court finds that plaintiff's advertising expenditures likely weigh in favor of the mark's secondary meaning.

The second factor, the availability of consumer studies linking the mark to a source, has no bearing on the present controversy since neither party submitted evidence with respect to consumer studies linking the mark to the source. Turning to the third factor in the secondary meaning inquiry, unsolicited media coverage, there is no information on this factor. The fourth factor in the secondary meaning inquiry is plaintiff's sales success as a result of its use of the mark. Although no exact number is available, it appears based on the evidence in the record that plaintiff's services have been well-received by the community. His chiropractic practice started in 2003 and appears to be well established five years later. However, given that more specific information relating to this factor is unavailable, the Court makes no finding as to plaintiff's sales success as a result of its use of the mark.

The Court now considers what is a significant factor in the secondary meaning analysis, which is the defendants' attempts to plagiarize the marks. Here, plaintiff states that defendants knew of plaintiff's domain name of www.healthsourchchiropractic.com and this was the reason they needed to distinguish its name and therefore, register a misspelling or an incomplete spelling of its assumed name (www.healthsourcechiro.com). Defendants' argue that the registration of the disputed domain name was done in good faith and at a time when the Franchisor was geographically remote from plaintiff's market. Notwithstanding plaintiff's allegations, the Franchisor defendant has demonstrated that its motive is benign, and accordingly, the Court finds that there is no evidence that the Franchisor plagiarized plaintiff's mark.

Finally, the Court considers the length and exclusivity of plaintiff's use of the mark. Plaintiff argues that it has used the mark since its inception in 2003, and that such use has been exclusive. There is no evidence of a hiatus or interruption of service that would suggest that this exclusive use has been disrupted. In contrast, defendants do not present evidence that plaintiff's use of the mark in the Rochester area is not exclusive in the Rochester area market. Therefore, the Court finds that plaintiff's use of the mark is most likely exclusive in the local Rochester area market. Based on the foregoing, the Court finds that the mark has likely acquired secondary meaning.

### b.   Confusingly Similar

The Court must now consider whether the domain name "www.healthsourcechiro.com" is identical or confusingly similar to plaintiff's mark, which is "www.healthsourcechiropractic.com".[4] The Court begins by noting that, for purposes of a claim made under the ACPA, "'[c]onfusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement adopted ... in Polaroid Corp. v Polaroid Elecs. Corp., 287 F.2d 492 (2d Cir. 1961)." See Sporty's, 202 F.3d at 498 n. 11 (citing Wella Corp. v. Wella Graphics, Inc., 37 F.3d 46, 48 (2d Cir. 1994); see also Omega, 228 F.Supp.2d at 126. Further, under the ACPA, "whether a domain name is confusingly similar to a trademark is to be evaluated 'without regard to the goods or services of the parties.'" See Omega, 228 F.Supp.2d at 127 (quoting 15 U.S.C. §1125(d)(1)(A)).[5] Accordingly, the Court examines the record to determine whether the Franchisor's domain name is "confusingly similar" to plaintiff's mark within the meaning of the ACPA by comparing solely plaintiff's mark and the Franchisor's domain name, including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use. See Omega, 228 F.Supp.2d at

---

[4] When evaluating whether a domain name is confusingly similar to a mark, a district court disregards the top-level domain name (e.g. ".com", ".org", ".net" etc.). See Omega S.A. v. Omega Engineering, Inc., 228 F.Supp.2d 112, 126, n. 36 (D.Conn.2002) (citing Sporty's Farm, 202 F.3d at 497-98).

[5] The ACPA's legislative history further corroborates the deduction, stating that Congress sought to stop "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce." See Omega, 228 F.Supp.2d at 127 n. 37.

127; see also Northern Lights Tech. v. Northern Lights Club, 97
F.Supp.2d, 96, 117-18 (D.Mass.2000). *affd*. 236 F.3d 57 (1st
Cir.2001). The Court concludes that the domain names
"www.healthsourcechiropractic.com" and "www.healthsourcechiro.com"
are confusingly similar. The names bear a visual resemblance that
internet users would reasonably assume that the names were modified,
used, approved and/or permitted by the plaintiff. The Court therefore
concludes that the Franchisor's "www.healthsourcechiro.com" domain is
confusingly similar to plaintiff's mark.

### c.   Bad Faith Intent To Profit

The final inquiry is whether or not defendants registered the
domain names with a bad faith intent to profit from the plaintiff's
mark. See 15 U.S.C. §1125(d)(1)(A)(I). The ACPA lists nine factors to
assist courts in determining whether a person has a bad faith intent
to profit from the use of a mark.[6] See 15 U.S.C. §1125(d)(1)(B)(I).

---

[6]Bad Faith intent to profit is determined by nine non-exclusive factors:

 (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

The Court is not limited, however, to considering only the listed factors when making a determination of whether the statutory criteria for bad faith have been met. See Sporty's Farm, 202 F.3d at 498; Omega, 228 F.Supp.2d at 131 ("the presence or absence of any of these factors may not be determinative") (citing Sen. Rep. No. 106-140, at 9 (1999)). Rather, the factors are indicia that may be considered along with other facts. See id. Indeed, the Second Circuit emphasized in Sporty's Farm that the most important ground for holding bad faith intent, was the unique circumstances presented in that case, which did not fit neatly into the specific factors outlined by Congress, but may nevertheless be considered under the statute. See Sporty's Farm, 202 F.3d at 499.

### I) trademark rights in the domain name

The Franchisor searched and cleared its name eight months before registering its domain name and invested substantial expenses in its name before registration. See Tomshack Aff., ¶16. Moreover, the Franchisor filed an intent-to-use federal trademark application for the word mark HealthSource Chiropractic in November 2005 and the mark HS-HealthSource and Design in December 2005, months before

---

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection(c)(1) of section 43. See 15 U.S.C. § 1125(d)(1)(B)(I).

15

registering its domain name. See id., ¶¶13-14. Accordingly, the Franchisor has, at present and at the time it registered its domain name, trademark rights in its registered domain name. A leading commentator has opined that this factor should weigh in favor of good faith even if a domain name holder has not yet used the domain name designation as a mark but can prove it had a bona fide intent to use as evidenced by filing of an intent-to-use application to register the designation as a mark with the USPTO. See 4 McCarthy on Trademarks §25:78. Here, the Franchisor had two federal trademark applications filed, and it used the mark before registering its domain name and before knowing about plaintiff's domain name. Thus, the balance weighs in favor of defendants.

### II)  domain name consists of the legal name

The second ACPA factor also weighs in favor of defendants. It is clear that the Franchisor's domain name consists of the legal name of the Franchisor. The Franchisor's legal name is Healthsource Chiropractic, Inc. and its domain name, www.healthsourcechiro.com is obviously an abbreviation of its legal name. See Sporty's Farm, 202 F.3d at 498-99 (Court found that the domain name, www.sportys.com did not consist of the legal name of the party that registered it, namely Omega); see also Hartog & Co. v. swix.com, 136 F.Supp.2d 531, 540 (E.D.Va. 2001) (no bad faith found in swix.com, which was part of defendant's Swiss trade name: SwiX Internet Dienote).

### III) prior use of the domain name in connection with the bona fide offering of services

The third factor also cuts against plaintiff evidencing a lack of bad faith on defendant's part because the Franchisor offered services in association with its name for some time even before registering its domain name. See Tomshack Aff., ¶¶6-11. Moreover, as discussed above, the Franchisor's domain name is closely associated with its legal name, which was selected without knowledge of plaintiff months prior to registering the franchisor's domain name.

### IV) bona fide noncommercial or fair use of the mark

This factor tips in plaintiff's favor since defendants concede, and there is no dispute that the Franchisor uses its domain for commercial purposes.

### V) intent to divert consumers

The fifth ACPA factor also tips in favor of the Franchisor defendant. Plaintiff argues that Dr. Divito was specifically informed of the likely confusing effect of using the HealthSource Chiropractic mark in the Rochester area. He further contends that since Dr. Divito's purchase of a franchise, there has been evidence of actual confusion, including third party websites containing links to plaintiff's website as the HealthSource Chiropractic, Inc. website as well as plaintiff being contacted by people seeking to purchase a franchise from defendant, HealthSource Chiropractic, Inc. In addition, plaintiff states that the Franchisor knew of plaintiff's existence which explains why it was forced to register a misspelling

17

of its name as www.healthsourcechiro.com instead of www.
healthsourcechiropractic.com. Defendants argue that from the time of
registering its domain name and continuing to the present, the
Franchisor has had no intention of diverting customers, i.e. patients
from Dr. Dudley's online location to the Franchisor's website.

The purpose of ACPA "was to respond to concerns over the
proliferation of cybersquatting-the Internet version of a land grab"
See Lewittes v. Cohen, 2004 WL 1171261 at *8 (S.D.N.Y. 2004) (internal
quotations and citations omitted). Specifically, the ACPA was
designed to focus on individuals who "register well-known brand names
as Internet domain names in order to extract payment from the
rightful owners of the marks, ... register well-known marks to prey
on consumer confusion by misusing the domain name to divert customers
from the mark owner's site to the cybersquatter's own site, and
target distinctive marks to defraud consumers, including to engage in
counterfeiting activities.'" See Lucas Nursery v. Grosse, 359 F.3d
806, 809 (6th Cir.2004) (quoting S.Rep. No. 106-104 at 5-6). Here, it
is clear that defendants did not purchase a domain name for the
purpose of holding it ransom so as to later extract payment from the
"rightful" owner of the mark. The Franchisor became aware of
plaintiff's domain name only at the time it attempted to register its
own domain name. Thereafter, the Franchisor registered an
abbreviation of its name since it obviously could not register the
same name. This does not support a finding that the Franchisor had an
intention to divert customers in the context of bad faith.

18

**VI)  offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain**

As discussed above, the purpose of the ACPA was to respond to concerns about the prototypical cybersquatter who seeks extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce. See Omega, 228 F.Supp.2d at 127 n. 37. The record shows that the Franchisor is not a cybersquatter as evidenced by its ever increasing number of franchisees beginning with one and currently having 170 franchisees. Further, the Franchisor only registers or owns domain names associated with its business. It does not warehouse, or have an established pattern of warehousing domain names consisting of various identical or similar combinations of the marks of others.

**VII) information when applying for registration of the domain name**

Plaintiff makes no allegation to the contrary that the Franchisor provided the correct contact information for its domain name. Thus, this factor weighs in defendants' favor.

**VIII) acquisition of multiple domain names which are identical or confusingly similar**

This factor tips in plaintiff's favor since the Court concluded that the Franchisor's domain name is confusingly similar to plaintiff's domain name.

### IX)   **distinctive and famous mark**

The Court has already determined that plaintiff's mark HealthSource Chiropractic is distinctive because it is a descriptive mark. Thus, this factor weighs in plaintiff's favor.

Based on all the above factors, specifically the purpose for which the ACPA was enacted, this Court finds that plaintiff has not produced sufficient evidence of bad faith. Thus, plaintiff is not likely to succeed on its ACPA claim.

### 2.   **Trademark Infringement - Lanham Act**

Plaintiff's mark, HealthSource Chiropractic, is not federally registered and therefore not presumptively entitled to protection. See 15 U.S.C. § 1057(b); see also Lois Sportswear, U.S.A. Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir.1986). However, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), may "protect[] an unregistered trademark ... against infringement." See Grupe v. Linda Lori Sportswear, Inc., 921 F.Supp. 987, 994 (E.D.N.Y.1996) (citing Coach Leatherware Co. v. Ann Taylor, Inc., 933 F.2d 162, 168 (2d Cir.1991)). Thus, plaintiff will prevail on the merits of its unregistered trademark infringement claim if it can show (1) that "it has a valid mark entitled to protection under the Lanham Act[7] and (2)

---

[7]There is no dispute that plaintiff is the senior user of the mark "HealthSource Chiropractic"in the Rochester area market. Indeed, defendants have agreed to refrain from using "HealthSource Chiropractic" within the Rochester area market, subject to plaintiff's submission of proof on the issue of the scope of the geographic area. The Court finds that plaintiff has submitted enough evidence in this preliminary injunction application to demonstrate that the geographical area within which Dr. Dudley's practice reaches through the use of the HealthSource Chiropractic mark extends to Monroe County and the surrounding contiguous counties, which include Livingston County, Ontario County, Genesee County and Wayne County.

that the defendant's use of it is likely to cause confusion." See 15 U.S.C. § 1125(a)(1)(A); see also Gruner+Jahr USA Publishing v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir.1993); Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1508-09 (2d Cir.1997); Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390 (2d Cir.1995).

Courts in this Circuit determine likelihood of confusion using the nonexclusive list of factors identified by the Second Circuit in Polaroid Corp. v. Polarad Elec. Corp., 287 F.2d 492, 495 (2d Cir.1961). These Polaroid factors are as follows:

1) strength of the mark;

2) degree of similarity between the marks;

3) proximity of the products;

4) likelihood that the owner of the mark will bridge the gap;

5) actual confusion;

6) defendant's good faith in adopting the mark;

7) quality of defendant's product; and

8) sophistication of the buyers.

See id.; see also Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 256 (2d Cir.1987). "[These] factors are designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue .... Therefore, each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." See Lois Sportswear, 799 F.2d at 872. The pertinent inquiry is not the possibility of confusion but, rather, the probability of confusion - specifically,

whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." See Gruner+Jahr, 991 F.2d at 1077; Estee Lauder, 108 F.3d at 1511.

### 1)   Strength of Plaintiff's Mark

As discussed above (see Point II.A.1.a), the Court has already determined that the plaintiff's mark is a descriptive mark entitled to some protection. Accordingly, this factor weighs in favor of finding a likelihood of confusion as to the HealthSource Chiropractic mark.

### 2)   Degree of Similarity and Proximity Between Marks

"It is appropriate to consider together the second and third Polaroid factors." See Hasbro Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 76 (2d Cir.1988). "To apply [the degree of similarity factor], courts must analyze the marks' overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." See Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir.2005). Courts must consider "whether the similarity between the two marks is likely to cause confusion and what effect the similarity has upon prospective purchasers." See Lexington Mgmt. Corp. v. Lexington Capital Partners, 10 F.Supp.2d 271, 283-84 (S.D.N.Y. 1998).

The third factor considers whether, based upon commercial proximity of competitive services, consumers may be confused as to

the source of the service. Such confusion occurs if consumers
mistakenly assume one service is associated with the other. In
considering the similarity, the focus is on the dominant part of the
mark - that which makes the greatest impression on the consumer. <u>See
Diner, Inc. v. Dream Kitchen, Inc.</u>, 1995 WL 438627 at *4
(S.D.N.Y.1995). As to the question of physical proximity, "the
geographic issue is not one that can be resolved based merely on
distance." <u>See</u> <u>id.</u>, at *5.

The marks here at issue are similar but are not identical. The
two elements of the marks that are identical are the words "Health"
and "Chiropractic." Dr. Divito's mark alters the second term to
"Quest" and drops the term "Source" from plaintiff's mark
(HealthSource Chiropractic vs. HealthQuest Chiropractic). Plaintiff
claims that Dr. Divito is mimicking its mark as much as possible but
still disclaiming an intent to trade on its good will.  Dr. Divito
argues that his mark sounds different and looks different. In
addition, he argues that the definition of "Quest" is different from
"Source." The Court finds that there is evidence of third party use,
both in this State and on the internet of the designation HealthQuest
for numerous health-related services, which includes chiropractic
services. Further, the name HealthQuest is a commonly-used name. For
these reasons, the similarity of the marks is not a strong factor in
favor of a finding of likelihood of confusion as to source although
they clearly connote services of the same nature.

As to proximity, the two entities' services clearly fall into the same area of commerce, which is to provide chiropractic treatment to patients seeking such care. Dr. Divito contends that his chiropractic clinic is seven miles away from Dr. Dudley's office and there is no evidence that the parties' services are geographically competitive. See Defs. Opp. Br. at 11. Plaintiff argues that he serves patients throughout the Rochester area market including Monroe County and the five contiguous counties, and this reaches beyond the seven mile radius of Dr. Divito's practice. See Pl. Reply Br. at 14. The Court notes that Dr. Divito and Dr. Dudley are direct competitors and the geographical distribution of patients for both offices are currently similar. Accordingly, this factor weighs in favor of a finding that patients of ordinary prudence would probably be confused as to the source of plaintiff's mark and thus of a likelihood of confusion as to both marks.

### 3)   Likelihood of Bridging the Gap

Where the parties compete in the same market, there is "no gap to bridge" and that factor tips in favor of a likelihood of confusion. See Kookai, S.A. v. Shabo, 950 F.Supp. 605, 608 (S.D.N.Y.1997). Here, Dr. Dudley and Dr. Divito are in the same market, making confusion likely. See Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 586 (2d Cir. 1993) (["T]he ...[services]... would compete in the same market, a factor that ... weighs in favor of finding a likelihood of confusion.")

24

### 4)   Actual Confusion

A plaintiff need not show actual confusion to prevail; however, the absence of proof of actual confusion favors a defendant. See Streetwise Maps, Inc. v. VanDam Inc., 159 F.3d 739, 745 (2d Cir.1998); Hasbro Inc., 858 F.2d at 76. Plaintiff has not come forward with any survey or other empirical evidence of actual confusion. Plaintiff cites, however, incidents that he characterizes as indicative of actual confusion. Plaintiff asserts that he has received e-mails from third parties seeking information about the Franchisor's business model and plaintiff has received phone calls from his patients asking whether a second location of his practice has been opened in Rochester. Importantly, plaintiff alleges that Dr. Divito's advertising still has references to "HealthSource Chiropractic" intermixed with "HealthQuest Chiropractic," which causes confusion. See Pls. Br. at 9. Although this is insufficient to show actual confusion, see Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir.2001) (two instances of confusion insufficient evidence to raise triable issues of fact on actual confusion), it does weigh in favor of finding a likelihood of confusion. See Madison Ave. Caviarteria, Inc. v. Caviaria.Com, 2004 WL 744481, at *2 (S.D.N.Y. Apr. 7, 2004) (confusion of one customer supported finding of likelihood of confusion).

Dr. Divito contends that he has ceased use of advertising materials with any reference to "HealthSource Chiropractic." Defendants claim that they always intended that Dr. Divito would use

HealthQuest Chiropractic for his advertising. Further, defendants argue that Dr. Divito's clinic is no longer listed on the Franchisor's internet website as "HealthSource of Rochester" but instead as "HealthQuest of Rochester." The Court has viewed the Franchisor's website, and as of the date of this decision, the Court takes judicial notice of the fact that Dr. Divito's office is no longer listed on the website as "HealthSource of Rochester," but is listed as "HealthQuest of Rochester." See www.healthsourcechiro.com. The Court finds that as long as Dr. Divito's advertising materials continue to be devoid of any reference to "HealthSource" or "HealthSource Chiropractic" and the Franchisor's website makes no reference to "HealthSource of Rochester" when referring to Dr. Divito's office, this factor weighs against finding a likelihood of confusion as to both marks.

### 5)   Bad Faith

This factor concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product." See Lang v. Ret. Living Pub. Co., 949 F.2d 576, 583 (2d Cir.1991). The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark. See NY State Soc'y of Certified Public Accountants v. Eric Louis Assoc., Inc., 79 F.Supp.2d 331, 348 (S.D.N.Y.1999). There is evidence showing that the Franchisor has used HealthQuest in

connection with chiropractic services dating back to 2001. Plaintiff has offered no evidence to show that defendants' selection of the name HealthQuest Chiropractic was done with anything other than a good faith intention to advertise its services to the consuming public. Accordingly, this factor weighs against finding a likelihood of confusion.

### 6)   Quality of Defendant's Product

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." See Arrow Fastener, 59 F.3d at 398; Gruner+Jahr, 991 F.2d at 1079 ("generally, quality is weighed as a factor when there is an allegation that a low quality [service] is taking unfair advantage of the public good will earned by a well-established high quality [service].") Here, plaintiff concedes that he makes no assertions that Dr. Divito's services are of an inferior quality. Thus, this factor does not weigh in favor of or against finding a likelihood of confusion.

### 7)   Sophistication of Purchasers

The last consideration enumerated by the Second Circuit in Polaroid is the sophistication of the buyer. "The more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." See Savin Corp. v. Savin Group, 391 F.3d 439, 461 (2d Cir.2004). Plaintiff concedes that purchasers of chiropractic care are sophisticated in that they could be expected to exercise greater care in making a selection of a

chiropractor and would be less likely to be confused as to source of the services. By its very nature, chiropractic care is individualized service by a trained licensed professional. Accordingly, this factor weighs against finding a likelihood of confusion.

In weighing all of these factors, the Court finds that five of the eight Polaroid factors favor the defendants. However, "no single Polaroid factor is determinative." See W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993) (The Polaroid factors do not exhaust the possibilities as the court may still have to take other variables into account). The Polaroid factors are to be weighed "holistically in determining whether the party seeking to establish an infringement claim has shown the probability of confusion of a substantial number of consumers of the relevant class." See 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, et al. 277 F.Supp.2d 356, 366 (2d Cir. 2003). The Court finds that defendants have not acted in bad faith and there is no likelihood of confusion as to the source of services with the potential of irreparably injuring plaintiff. Dr. Divito has stopped using advertising materials with references to "HealthSource Chiropractic" and as of this date the Franchisor's internet website has ceased listing Dr. Divito's office as "HealthSource of Rochester" and instead has it listed as "HealthQuest of Rochester." Accordingly, plaintiff is not entitled to a preliminary injunction.

If plaintiff can show in the future that defendants have not cured their use of the name "HealthQuest Chiropractic" versus

"HealthSource Chiropractic" with respect to Dr. Divito's advertising materials and if plaintiff can demonstrate that the Franchisor is once again listing Dr. Divito's office as "HealthSource of Rochester" instead of "HealthQuest of Rochester," then the Court will revisit its ruling to determine whether defendants' acts should be enjoined. See MultiSorb Tech., Inc., v. Impak Corp. et al., 2006 WL 1073036 (W.D.N.Y.2006) ("purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.'") (citations omitted).

## B.   Irreparable Harm

A presumption of irreparable harm arises in Lanham Act cases once the plaintiff establishes likelihood of success on its claim. See McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1548-49 (2d Cir. 1991); Church of Scientology Int'l. v. Elmira Mission of Church of Scientology, 794 F.2d 38, 41-42 (2d Cir. 1986) (except in "rare cases," irreparable harm "almost inevitably follows from likelihood of confusion). This is only a presumption, however, and it vanishes if the plaintiff unreasonably delays prosecuting his infringement claim. See Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) ("[l]ack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm ...."); see also Citibank N.A. v. Citytrust, 756 F.2d 273, 276 ("[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," and

29

a delay in enforcement "tends to indicate at least a reduced need for such drastic, speedy action").

Defendants argue that Dr. Dudley waited almost a year after he sent the cease and desist letters before filing a motion seeking preliminary injunctive relief and his only excuse for the delay was to "wait and see" if there was confusion. See Defs. Opp. Br. at 14-15. Plaintiff contends that he did not unreasonably delay in filing the preliminary injunction against defendants. Plaintiff states that he was unaware of the extent to which defendants would infringe on his mark and so he investigated further before filing any papers. See Pls. Reply Br. at 17-18. "Delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is." See Fisher-Price Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 124 (2d Cir. 1994) (citations omitted). "Likewise, a delay caused by a plaintiff's good faith efforts to investigate an infringement should not rebut the presumption." Id. The issue becomes whether plaintiff's delay before suing for an injunction was reasonable. The Court finds that the delay was reasonable.

Here, when plaintiff sent the cease and desist letters in April 2007, defendants' use of their marks in the Rochester area market were only anticipated. In this regard, and to prevent anticipated infringement, plaintiff's counsel sent each of the defendants a letter informing them of the allegedly infringing action and that such action would not be condoned. According to plaintiff, it was not

30

until September 2007 that he first became aware of a newspaper insert that was brought to him by a patient with reference to both HealthSource Chiropractic and HealthQuest Chiropractic. Once it became clear that defendants' actions were causing third-party confusion, plaintiff applied for preliminary injunctive relief. This can hardly be characterized as unreasonable delay and accordingly, plaintiff is entitled to the presumption of irreparable harm.

However, where the relief sought by the plaintiff will alter the status quo or will provide "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," a higher standard applies. See Tom Doherty Assoc. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cri. 1995). Under this standard, an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." See Id. (citation omitted). A plaintiff in such circumstances must demonstrate that irreparable harm will be suffered in the absence of such an injunction. See id. at 37039. Here, the higher standard applies because the plaintiff seeks to alter the status quo by precluding the Franchisor's use of the internet domain name www.healthsourcechiro.com and precluding Dr. Divito from using the name HealthQuest for his chiropractic business. The Court finds that plaintiff has not established irreparable harm as the Court has found that plaintiff is not likely to succeed on its ACPA claim and there is no likelihood of confusion with respect to the HealthQuest

31

versus HealthSource mark. Plaintiff has not shown that his customers have been induced to seek chiropractic care from Dr. Divito as a result of the HealthQuest Chiropractic mark. Thus, there is no potential for irreparable injury to the plaintiff.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that plaintiff's motion for a preliminary injunction is **Denied**. Plaintiff has failed to demonstrate a likelihood of success on its Anti-Cybersquatting Consumer Protection Act claim. Plaintiff has not satisfied the requirements for a preliminary injunction with regard to Dr. Divito's use of the mark "HealthQuest Chiropractic." However, if plaintiff is able to show in the future that defendants are using the name "HealthSource" or "HealthSource Chiropractic" in any of Dr. Divito's advertising materials or by listing "HealthSource or Rochester" when referring to Dr. Divito on the Franchisor's website, then the Court, upon application and notice will revisit the issue.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          September 30, 2008